In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1362

LISA M. LEGER,

*Plaintiff-Appellant*,

*v.*

TRIBUNE COMPANY LONG TERM
DISABILITY BENEFIT PLAN,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-06388—**Robert W. Gettleman**, *Judge.*

ARGUED OCTOBER 28, 2008—DECIDED MARCH 9, 2009

Before BAUER, RIPPLE and EVANS, *Circuit Judges*.

RIPPLE, *Circuit Judge.* After the Tribune Company Long
Term Disability Benefit Plan ("the Plan") terminated the
disability payments that Lisa M. Leger had been receiving
since 1990, Ms. Leger filed this ERISA action under 29
U.S.C. § 1132(a)(1)(B) for payment of benefits due. The
district court granted the Plan's motion for summary
judgment, and Ms. Leger appealed. For the reasons set

forth in the following opinion, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

### 1.

Ms. Leger suffers from osteoarthritis in both knees. Over the years, several physicians have treated Ms. Leger's condition with a regimen of exercise and with arthroscopic surgery. Between 1986 and 1990, Ms. Leger underwent three arthroscopic procedures. After the surgeries, she enjoyed increased mobility and was able to engage in a rehabilitative exercise program.

In June 1990, however, as a result of chronic pain in both knees, Ms. Leger ceased working as a program planning manager for WGN-TV, part of the Tribune Company. Following several months of short-term disability payments, the administrator of the Plan, CNA, approved the payment of long-term disability benefits, which Ms. Leger began receiving in December 1990.[1]

---

[1] Ms. Leger also applied for disability benefits through the Social Security Administration. These payments initially were denied. After an administrative appeal, her claim was approved, and she was awarded benefits.

When Ms. Leger began receiving disability payments in 1990, she was being treated by Dr. Prodromos. At that time, he believed that her knee condition had improved; however, she still was complaining of pain and instability. Consequently, Dr. Prodromos referred Ms. Leger to Dr. DeHaven, who concluded that Ms. Leger's subjective reports of pain were not consistent with his medical observations.

In 1991, Ms. Leger was examined by another orthopedic surgeon, Dr. Nuber.[2] Dr. Nuber observed that Ms. Leger had degenerative changes in both knees, that she used a cane for short distances and that she used crutches for longer distances. Dr. Nuber recommended avoiding further surgical intervention.

Later, Ms. Leger received treatment from Dr. Steadman. Between 1992 and 1996, Ms. Leger traveled to Vail, Colorado, semiannually to see Dr. Steadman. During this time, Dr. Steadman performed a total of four arthroscopic procedures on Ms. Leger's knees (two per knee). Dr. Steadman noted that Ms. Leger was happy with the results of the surgery and had an "excellent" range of motion in both knees. ML 0921.[3] However, the relief proved to be only temporary.

In 1996, after the birth of her first child, Ms. Leger sought treatment from Dr. Hill, whose practice was located in

---

[2] Ms. Leger went to Dr. Nuber for an evaluation related to her disability claim.

[3] References are to Met Life's administrative file located at R.36 at 1-4.

the Chicago area. Dr. Hill continues to serve as Ms. Leger's primary orthopedic physician. Dr. Hill first prescribed a program of strengthening exercises for Ms. Leger. After Ms. Leger gave birth to her second child, she began experiencing more pain and less mobility in her right knee, and Dr. Hill performed an arthroscopy on that knee. Ms. Leger's right knee then began to improve.

In 1998, Ms. Leger began to complain of pain associated with a small lump in the back of her right knee, which subsequently was determined to be a benign cyst.[4] During a follow-up examination with Dr. Hill in March 1999, Dr. Hill noted that Ms. Leger's main discomfort at that time was associated with this cyst.

In May 2001, in response to Ms. Leger's complaints of increased knee pain, Dr. Hill performed an arthroscopic debridement of Ms. Leger's right knee. The procedure resulted in Ms. Leger enjoying a "full range of motion" in that knee. ML 1106.

Ms. Leger returned to Dr. Hill in October 2001 because her right knee was "giv[ing] way" as a result of walking her dog. ML 1114. Dr. Hill recommended decreasing her level of physical activity. Between 2001 and 2004, Ms. Leger continued to see Dr. Hill. A radiology report from April 27, 2004, concluded that Ms. Leger had experienced "minimal to moderate degenerative change" and "[n]o appreciable change since 22 May 01." ML 0877.

---

[4] A total of four physicians evaluated Ms. Leger's knee and concluded that the mass was a benign cyst.

In August 2004, Ms. Leger traveled to Athens, Greece, to attend the Olympic Games. She took precautions to minimize the adverse effects that the travel and other activities would have on her knees. Even so, she missed some events as a result of her condition. Upon her return from Athens, Ms. Leger saw Dr. Hill because she was experiencing knee pain as a result of her increased walking while at the Olympics. Dr. Hill performed another arthroscopy of Ms. Leger's right knee in December 2004 to repair a small meniscal tear. After the surgery, Dr. Hill reported that Ms. Leger was "extremely happy with her surgical result and feels that she has less right knee discomfort than she had prior to surgery." ML 0725. In a follow-up visit on January 31, 2005, Dr. Hill noted that Ms. Leger was "doing extremely well," "ha[d] minimal problems with her right knee" and was "ambulatory without any external aid." ML 0726.

### 2.

Ms. Leger received benefits for almost fifteen years. During this time, the Plan first was administered by CNA and then, beginning in 2004, by The Hartford Insurance Company.

In 2005, Metropolitan Life Insurance Company ("Met Life") became the Plan's administrator. As part of a review of Ms. Leger's benefits, Met Life requested updated information from Ms. Leger and her treating physician, Dr. Hill. In his reply, Dr. Hill stated that Ms. Leger's condition prevented her from sitting more than one hour during an eight-hour period and from sitting for

more than thirty minutes in any given hour. *See* ML 0248. Dr. Hill also stated that he had not advised Ms. Leger to return to work because she was "wheel chair bound[,] essentially unable to walk." *Id.* at 0246. These materials, as well as Ms. Leger's medical history, were provided to Dr. Kevin Smith for review. In his report, Dr. Smith stated:

> The medical records do not indicate objective clinical evidence on examination and testing, surgical report, diagnoses or pathology of a severity that would preclude her from gainful employment within a wide array of jobs within a sedentary work capacity level. The medical records are confusing in that she was very pleased with the surgical results on the January 2005 office visit and was noted to be wheelchair bound and unable to stand for more than 1 hour in an 8-hour time period per APS statements in late March of 2005. The records indicate significant osteoarthritis of the knees but do not indicate findings or impairments of a severity that would preclude sedentary work in this 44-year-old employee.

ML 1786.[5]

Grace Choi, a vocational rehabilitation consultant, conducted an employability assessment based on Dr. Smith's evaluation. The assessment identified several sedentary employment positions for which Ms. Leger possessed the necessary qualifications. Met Life therefore determined that Ms. Leger was capable of performing

---

[5] Met Life provided a copy of Dr. Smith's review to Dr. Hill, and solicited his comments; Met Life received no response.

sedentary work and terminated her benefits on October 12, 2005. *See* ML 1778-79.

Ms. Leger appealed the decision internally and supplied Met Life with additional personal information, witness statements and medical documentation.[6] She also submitted a Functional Capacity Evaluation ("FCE"), which was prepared by a physical therapist, Joseph Rappa, on February 22, 2006. In the FCE, Rappa indicated that Ms. Leger had exerted full effort during the tests and that her subjective reports of pain and associated disability were both reasonable and reliable. ML 0482, 0459. In his recommendations, Rappa wrote:

> It is recommended that clinical and/or vocational decision be made with the results of this report taken into consideration.
>
> —Avoid full/partial squat lifting.
>
> —Limit carrying for any distance.
>
> —Limit shoulder to overhead lifting to a maximum of 18 pounds.
>
> —Limit knuckle to shoulder lifting to a maximum of 18 pounds.
>
> —Limit pushing/pulling for any distance.

---

[6] On November 18, 2005, while Ms. Leger's appeal was pending, Dr. Hill performed an arthroscopy on her left knee. Ms. Leger returned to Dr. Hill in February 2006, on crutches, complaining of increased left-knee pain due to a fall. Dr. Hill advised Ms. Leger to continue to use the crutches and to decrease her weight-bearing activities.

—Avoid being in a specific position (seated or standing) for long periods of time.

ML 0487. Dr. Hill also provided the following assessment:

Ms. Lisa Leger has been a patient of mine since January 8, 1996. She has had significant problems with both knees that date back to the late 70's. She has had almost ten surgical procedures on each knee. She is presently severely disabled and needs crutches to ambulate. She recently had a Functional Capacity Evaluation on February 22, 2006, which concurs with her ongoing several limitations. She is unable to perform any job activity which requires standing, walking or prolonged sitting greater than thirty minutes.

ML 0490.

Met Life retained Dr. Michael J. Chmell, an orthopedic surgeon, to review Ms. Leger's file. In Dr. Chmell's report, he perceived some inconsistency in the information that Dr. Hill had provided:

On 3/28/05, forms are provided by Dr. Hill, the first of which is believed to be a functional capacity type of form in which it is stated that Ms. Leger is only capable of sitting for one hour per day. Rationale for this inability to sit for more than one hour per day is not provided; records do not indicate how Ms. Leger's knee disorder would have any impact upon her ability to sit. A second attending physician statement provided by Dr. Hill, also dated 3/28/05, notes that Ms. Leger is wheelchair bound. It states that she is essentially unable to walk. This is in stark contrast to

the office note documented above from 1/31/05, wherein Ms. Leger was noted to have minimal problems with her knee and was encouraged to continue with an exercise program. Now it is stated that she is wheelchair bound. Even if Ms. Leger was truly unable to walk, it would have no bearing upon her ability to carry out sedentary work. It is very confusing to me that at one point Ms. Leger is noted to be doing well and then next is noted to be wheelchair bound. Also, the fact that it is stated Ms. Leger cannot sit for more than 30 minutes at a time, is not consistent with being wheelchair bound, which would mean that she is sitting passively. No data is presented to support the assertion that Ms. Leger cannot sit for more than one hour per day.

ML 0112. With respect to Ms. Leger's ability to work, Dr. Chmell stated:

Ms. Leger would be limited in her ability to carry out any type of weight bearing activities due to the diagnosis of documented significant arthritis of both knees. She would be able to stand or walk for only brief periods of time and climb one flight of stairs only occasionally. She can lift up to 10 pounds occasionally. She can carry up to 10 pounds occasionally. She can push or pull up to 25 pounds occasionally. She would be able to bend, squat, or twist only occasionally. She has unrestricted use of the upper extremities and unrestricted use of the axial skeleton and can sit for an unlimited period of time.

ML 0113.

Additional information concerning Ms. Leger's medical history was supplied to Dr. Chmell, who then supplemented his original report. Dr. Chmell stated:

> On March 27, 2006, a letter is provided from Dr. Hill, which states that Ms. Leger is presently severely disabled and needs crutches to ambulate. Dr. Hill writes that Ms. Leger is unable to perform any job, which requires prolonged sitting greater than 30 minutes. He does not provide any objective medical evidence of a disorder of a severity enough to preclude unlimited sitting. Ms. Leger has no disorder, which would preclude unlimited sitting. This reviewer is a board-certified orthopedic surgeon in full-time clinical practice and my practice involves the treatment of arthritic hips and knees. In no way, does Ms. Leger have a diagnosis, which would preclude an unlimited ability to sit in my opinion. I am very experienced on a daily basis with taking care of such individuals with endstage arthritis of the knee and there is absolutely no reason why Ms. Leger cannot sit for an unlimited period of time.

ML 0109. Relying on Dr. Chmell's medical review, Met Life upheld the decision to terminate Ms. Leger's benefits on May 26, 2006. *See* ML 0094-97.

## B. District Court Proceedings

Ms. Leger commenced this action pursuant to 29 U.S.C. § 1132(a)(1)(B) to reinstate her long-term disability benefits. After the close of discovery, both parties moved for

summary judgment. In rendering its decision, the district court noted that the parties agreed that the plan accorded the administrator discretion, and, therefore, the arbitrary-and-capricious standard of review applied. *See* R.57 at 5. Quoting our decision in *Houston v. Provident Life & Accident Insurance Co.*, 390 F.3d 990, 995 (7th Cir. 2004), the court observed that it was required to uphold the administrator's decision if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome . . . ." *Id.* at 5-6.

Applying this standard to the evidence before it, the court determined that the "defendant ha[d] advanced a reasonable explanation for its decision to terminate plaintiff's disability benefits." *Id.* at 6. The court explained:

> Defendant provided plaintiff's medical records to two of its physicians, who reviewed the file in its entirety, including plaintiff's history of surgeries and care by numerous doctors. Defendant then weighed the opinions of its doctor against those of plaintiff's treating physician and made a reasonable choice among conflicting medical opinions.

*Id.* The district court rejected Ms. Leger's argument that the Plan's decision to terminate her benefits was unreasonable because it had not documented any improvement in her condition; the court noted that ERISA did not require that the Plan show that her condition had improved, only that the decision to terminate was reasonable. Additionally, it rejected Ms. Leger's claim that the Plan's decision was arbitrary and capricious because the Plan's physicians had not conducted a physical examination, but

only a file review. Finally, the court did not accept Ms. Leger's argument that the physicians retained by the Plan's administrator were biased because they had received remuneration for their services.

Ms. Leger timely appealed the district court's entry of summary judgment in favor of the Plan.

## II

## ANALYSIS

### A.

Before the district court, the parties agreed that the arbitrary-and-capricious standard of review applied. Ms. Leger now maintains, however, that the Supreme Court's recent decision in *Metropolitan Life Insurance Company v. Glenn*, 128 S. Ct. 2343 (2008), alters the way that courts must evaluate claim determinations. Essentially, Ms. Leger reads *Glenn* as "necessitating a more penetrating scope of judicial review than has previously been utilized." Appellant's Reply Br. 3.

### 1.

In *Glenn*, the Court considered how courts should review the denial of benefits under ERISA when a single entity is both the plan administrator and the payor of the bene-fits. The Court determined that this dual role constitutes a conflict of interest, "that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in

denying benefits, and that the significance of the factor will depend upon the circumstances of the particular case." *Id.* at 2346.

After reviewing the factual and legal background of the case before it, the Court turned to its recent decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). *Firestone* established that, when a claimant is denied benefits under a plan providing the administrator with discretionary authority to determine eligibility, the plan's determination should be accorded deference, i.e., evaluated according to an abuse-of-discretion standard. *See id.* at 2348 (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). The Court noted that *Firestone* also established that, when "an administrator or fiduciary . . . *is operating under a conflict of interest*, that conflict must be *weighed as a 'factor* in determining whether there is an abuse of discretion.'" *Id.* (emphasis in original) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, cmt. d)).

After concluding that this last principle was implicated when the same company both determines eligibility and pays benefits, the Court then turned to the question of how a court should account for that conflict of interest in its review of the benefits determination. The Court rejected the idea that it should abandon a deferential standard of review with respect to benefit determinations. Additionally, it did not believe that it was "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.*

at 2351. Instead, the Court determined that the conflict of interest was simply one of many factors that a court must consider in conducting its review.

**2.**

Our study of *Glenn* convinces us, first, that the decision is best read as an extension of the Court's previous decision in *Firestone* and, second, that it is not applicable to the present case. Fairly read, *Glenn* explains how the general principle established in *Firestone* should be applied to the more specific case in which responsibility for both claim determinations and pay-outs is vested in the same entity. In such a situation, a court is required to take such an obvious conflict of interest into consideration—along with all of the other relevant factors—in determining whether the entity's determination was arbitrary and capricious. Contrary to Ms. Leger's claims, the Court's decision in *Glenn* did not create a new standard of review—a "heightened arbitrary and capricious standard"—for claims involving a conflict of interest.[7] It would

---

[7] Ms. Leger's use of "heightened arbitrary and capricious" standard is a reference to a case from the Eleventh Circuit, *Williams v. Bellsouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004). In that case, the court determined that a heightened arbitrary and capricious standard applied when there was a conflict of interest present created by the dual role of administrator and payor.

However, two more recent cases from the Eleventh Circuit, decided after *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct.

(continued...)

be an even more serious misreading of *Glenn* to suggest that it establishes a "heightened arbitrary and capricious standard" for cases in which the administrator and the payor are two separate entities. Indeed, that situation simply was not before the Court.

The correct standard of review to be applied in this case is the arbitrary-and-capricious standard. *See Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. #506*, 545 F.3d 555, 559 (7th Cir. 2008) (holding that where an ERISA plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a denial of benefits is reviewed under the arbitrary and capricious standard). Under that deferential standard of review, however, the termination procedure and determination still must comply with the requirement of ERISA "that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." *Id.* (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688-89 (7th Cir. 1992)). Furthermore, "[w]e will not uphold a termination when there is an absence of reasoning in the record to support

---

[7] (...continued)
2343 (2008)—*Doyle v. Liberty Life Assurance Company of Boston*, 542 F.3d 1352 (11th Cir. 2008), and *White v. Coca-Cola Company*, 542 F.3d 848 (11th Cir. 2008),—acknowledge that *Glenn*, "cast doubt" on the evaluation process it previously had employed for the denial of ERISA-plan benefits, namely the use of a "heightened arbitrary and capricious review." *White*, 542 F.3d at 854.

it." *Id.* (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003)).

**B.**

Ms. Leger next submits that Met Life's discontinuation of her benefits should be viewed as presumptively arbitrary and capricious for several reasons. We consider Ms. Leger's contentions below.

First, Ms. Leger claims that it was incumbent on Met Life to show an improvement in her condition before it terminated her disability payments. She acknowledges that "this court has never explicitly said" that terminations of benefits without a show of improvement are arbitrary and capricious. Appellant's Br. 14. However, she essentially submits that our case law is "no differen[t]" from that of the Eighth Circuit, *id.*, which has stated:

> We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue benefits.

*McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002).

Ms. Leger reads the Eighth Circuit's decision too broadly. The fact that a plan administrator has made an initial benefits determination in favor of the claimant is evidence

that, at least initially, the administrator believed that the claimant was disabled as defined by the plan. However, as specifically noted by the Eighth Circuit, the previous payment of benefits is just one "circumstance," i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome. *Id.*

Ms. Leger next maintains that Met Life's determination should be considered presumptively invalid because it rests on the opinion of Dr. Chmell, who conducted a medical file review as opposed to a physical examination. We previously have rejected this argument. In *Davis v. Unum Life Insurance Co. of America*, 444 F.3d 569 (7th Cir. 2006), we stated:

> The district court and Davis also fault Unum for relying on "a mere paper review," lamenting the fact that Unum's doctors did not personally examine Davis or speak with his doctors. However, neither the district court nor Davis has cited, and our research has not disclosed, any authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files. In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations. *See*

> *Dougherty* [*v. Indiana Bell Tel. Co.*], 440 F.3d 910, [915 (7th Cir. 2006)] (reasonable for administrator to take fair-minded actions aimed at conserving plan assets for the benefit of all participants and beneficiaries).

*Id.* at 577 (parallel citations omitted). Furthermore, the Supreme Court has rejected the argument that the opinions of treating physicians deserve special consideration in benefits determinations: "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation why they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

In sum, neither the previous payment of benefits nor a decision at odds with an opinion of a treating physician creates a presumption that the termination of benefits was arbitrary and capricious.

## C.

As we noted earlier, when determining whether a decision to terminate benefits was arbitrary and capricious, we look to whether "specific reasons for denial [were] communicated to the claimant," whether "the claimant [was] afforded an opportunity for 'full and fair review' by the administrator," and whether "there is an absence of reasoning" to support the plan's determination. *See Tate*, 545 F.3d at 559. Ms. Leger does not maintain that the Plan failed to articulate its reasons for the denial of her claim.

Instead, the crux of her argument is that, in terminating her benefits, the Plan cherry-picked the statements from her medical history that supported the decision to terminate her benefits, while ignoring a wealth of evidence to support her claim that she was totally disabled. We believe there is some merit to Ms. Leger's position.

The decision to terminate benefits is four pages long and traces many aspects of Ms. Leger's medical history. It is particularly detailed in reviewing Dr. Hill's treatment of Ms. Leger's condition since September 2004. The decision correctly notes that, on their face, some of the medical records are difficult to reconcile with her physician's assessment of her physical abilities. For instance, on January 31, 2005, almost two months after her December 7, 2004 surgery, Dr. Hill reported that Ms. Leger was "doing extremely well with minimal problems with the right knee"; however, in an attending physician statement dated March 28, 2005, Dr. Hill reported that Ms. Leger was wheelchair bound and "essentially unable to walk." ML 0095.

A statement that a surgery has been successful or that a patient is pleased with the results must be viewed in light of the patient's existing condition and future expectations. If an otherwise healthy person underwent an arthroscopic procedure, proclaimed afterward that she was pleased with the result, but less than two months later claimed that she was dependent on a wheelchair for mobility, the Plan would be well within its discretion in viewing the claim with skepticism. However, in this case, the seemingly inconsistent statements must be

viewed in light of Ms. Leger's lengthy medical history. Ms. Leger may have been pleased with results that diminished her pain and allowed her some additional mobility; her statement to that effect, however, is not inconsistent with the fact that she also still may rely on a wheelchair as her primary means of getting from one place to another. Indeed, one of the key shortcomings of the Plan's determination is that it fails to mention the voluminous medical record that both predates Ms. Leger's initial award of disability benefits and that spans the time between that award of benefits and Met Life's review of those benefits in 2005. *See McOsker*, 279 F.3d at 590 ("We have recently had occasion to remark that in determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them.").

The complete record reveals that Ms. Leger suffers from a debilitating condition and must expend a great deal of effort to cope with her condition. She has had seventeen surgeries and procedures over the last twenty years. It also is the case that her condition is degenerative: Ms. Leger's efforts are not designed to restore her condition to that of a normal, healthy individual, but instead are intended merely to improve her strength and stability from their existing levels. Her and her doctor's statements with respect to her progress and surgical successes must be evaluated with this history in mind.

Our other key concern with the Plan's determination is its treatment of the functional capacity evaluation. The

evaluator concluded, as did Dr. Hill, that Ms. Leger was limited in her ability to sit in one position for extended periods of time. *See* ML 0460. Although this determination was based on Ms. Leger's subjective complaints of pain, the evaluator concluded that Ms. Leger's complaints of pain, and accompanying physical limitations, were both reasonable and reliable. ML 0485.

The Plan's determination (based on Dr. Chmell's file review), however, gave short shrift to this aspect of the FCE:

> The findings of the Functional Capacity Evaluation were consistent with sedentary work duties in terms of limiting heavy lifting, pushing and pulling and squatting or carrying over distances. Recommendations from this Functional Capacity Evaluation states that you should avoid being in a specific position such as seated or standing for long periods of time. The reviewing consultant [Dr. Chmell] finds that this is based on your subjective complaints and is not supported by any objectively documented deficit, which would prevent maintaining a seated position for an extended period of time. This consultant finds that you have no documented disorder of your axial skeleton, which would prevent unlimited sitting activities.

ML 0096.

Ms. Leger argues that Dr. Chmell discounted the recommended limitation in the FCE because it was based on Ms. Leger's subjective complaints of pain as opposed to any identifiable physiological source. She further argues that this court's decision in *Hawkins v. First Union Corp.*, 326 F.3d 914 (7th Cir. 2003), established that complaints

of pain cannot be dismissed out of hand because they are subjective. We agree.

In *Hawkins*, the claimant suffered from fibromyalgia. His application for long-term disability benefits was denied in part on the reviewing physician's determination that the claimant was capable of working. With respect to the quality of the reviewing physician's report, we stated:

> But the gravest problem with Dr. Chou's report is the weight that he places on the difference between subjective and objective evidence of pain. Pain often and in the case of fibromyalgia cannot be detected by laboratory tests. The disease itself can be diagnosed more or less objectively by the 18-point test (although a canny patient could pretend to be feeling pain when palpated at the 18 locations—but remember that the accuracy of the diagnoses of Hawkins' fibromyalgia is not questioned), but the amount of pain and fatigue that a particular case of it produces cannot be. It is "subjective"—and Dr. Chou seems to believe, erroneously because it would mean that fibromyalgia could never be shown to be totally disabling, which the plan does not argue, that because it is subjective Hawkins is not disabled.

*Id.* at 919. Despite the infirmity in the report, we still believed that it was a "close case" because of the deferential standard of review. *Id.* However, we determined that the employer's "discretion [wa]s not unlimited," and there simply was not sufficient evidence of capability to offset the evidence of disability presented by the claimant.

Here, it appears to us that Dr. Chmell's report, which discounts the FCE because it is based upon "Ms. Leger's

subjective complaints" and "not supported by any objectively documented deficit," suffers from the same short-comings as the report in *Hawkins*. Dr. Chmell dismissed Ms. Leger's complaints of pain and attendant limitations on movement because there was "no objective medical evidence of a disorder" that would suggest the severity of pain Ms. Leger was experiencing. ML 0109. However, as noted in *Hawkins*, even if the source of pain cannot be located, it nonetheless can be real. Furthermore, here the Plan ignored the evidence in the FCE that Ms. Leger's complaints of pain were reliable. Under these circumstances, we believe it was incumbent on the Plan (or the Plan's consultant) to do more than just dismiss the complaints out of hand. Instead, the Plan must explain why, despite evidence to the contrary in the FCE, it nevertheless finds Ms. Leger's complaints of pain unreliable and why, if the complaints in fact are reliable, the pain Ms. Leger is experiencing is not completely debilitating. Without further explanation, there is an "absence of reasoning in the record" to support the Plan's conclusion that Ms. Leger is capable of sitting without limitation and, therefore, performing sedentary work.[8]

---

[8] We recognize that Hawkins' diagnosis of fibromyalgia is different in material respects from Ms. Leger's diagnosis of osteoarthritis. As we noted in *Hawkins*, fibromyalgia presents especially difficult questions with respect to whether it is disabling because its very diagnosis, as well as the determination of its severity, are based on symptoms that are "entirely subjective." *Hawkins v. First Union Corp. Long-Term Disability*

(continued...)

Because the Plan's determination failed to consider Ms. Leger's complete medical history and rejected, without explanation, important aspects of the FCE, we believe that the Plan acted in an arbitrary and capricious manner in terminating Ms. Leger's benefits.

## D.

"Courts that find a plan administrator's denial of benefits to be arbitrary and capricious may either remand the case for further proceedings or reinstate benefits." *Tate*, 545 F.3d at 562-63. However, "[g]enerally, when a court or agency fails to make adequate findings or fails to provide an adequate reasoning, the proper remedy in an ERISA case . . . is to remand for further findings or

---

[8]  (...continued)
*Plan*, 326 F.3d 914, 916 (7th Cir. 2006). Consequently, a search for an objectively verifiable source of pain would be futile.

Here, Dr. Chmell's search for an objective, physical source of Ms. Leger's pain is not nonsensical, it simply is incomplete. In rejecting Ms. Leger's claim of pain as untraceable to a documented disorder, Dr. Chmell focused on the condition of Ms. Leger's axial skeleton. However, Dr. Chmell does not address whether there could be pain associated with Ms. Leger's *documented disorder*, osteoarthritis, that would cause her pain if she remained in a sedentary position—in an office chair with knees bent—for an unlimited period of time. Additionally, as explained above, the need for further explanation is even greater given the FCE's findings that Ms. Leger's complaints of pain were reliable.

explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* at 563 (internal quotation marks and citations omitted). Here, we remand because the Plan failed to consider adequately Ms. Leger's lengthy history of medical treatment and to provide adequate reasoning for its rejection of portions of the FCE. However, on the record before us, we cannot say definitively that it was unreasonable for the Plan to terminate Ms. Leger's benefits. There is evidence in the record that Ms. Leger is able to engage in sedentary activities for extended periods of time and also is able to engage in some minimal physical activity. Consequently, we believe that the correct course of action is to remand this case for further findings and explanations.[9]

## Conclusion

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further

---

[9] Because we have not ordered Ms. Leger's benefits reinstated, her request for attorneys' fees is premature. We previously have held that "a claimant who is awarded a remand in an ERISA case generally is not a 'prevailing party' in the 'truest sense of the term,'" *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. #506*, 545 F.3d 555, 564 (7th Cir. 2008) (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478-79 (7th Cir. 1998)), and Ms. Leger has not argued that attorneys' fees should be awarded in the absence of an order for reinstatement of benefits.

proceedings consistent with this opinion. Ms. Leger may recover her costs in this court.

REVERSED and REMANDED